UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KAREN L. HICKS,

        Plaintiff,

-vs-                                  Case No.:  8:15-cv-00454-VMC-TBM

WELLS FARGO BANK, N.A., a foreign
Corporation, ALDRIDGE CONNORS, LLP,
A foreign Limited Liability Partnership,
ASSURANT, INC., a foreign corporation, and
AMERICAN SECURITY INSURANCE
COMPANY, a foreign corporation,

        Defendants.

_____/

## SECOND AMENDED COMPLAINT [1]

Plaintiff, KAREN L. HICKS, sues the Defendants, WELLS FARGO BANK, N.A.,

ALDRIDGE CONNORS, LLP, ASSURANT, INC., and AMERICAN SECURITY INSURANCE

COMPANY, and alleges as follows:

### JURISDICTION AND VENUE

1.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 as this case presents a

federal question, and pursuant to 28 U.S.C. § 1367 for pendant state law claims.

2.      Plaintiff brings this action to recover damages for Defendants' acts in violation of

the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, *et seq*., (hereafter "TCPA") the

Florida Consumer Collection Practices Act, sections 559.55, *et seq*., Florida Statutes (hereafter

"FCCPA"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (hereafter "FDCPA"),

the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, (hereafter "RESPA"), the

---

[1] Amended to include referenced exhibits, which were inadvertently omitted when filing the First Amended
Complaint (Dkt. 39)

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d), (hereafter "RICO"), and for common law Intentional Infliction of Emotional Distress and Slander of Credit.

3.      The alleged violations described herein occurred in Pinellas County, Florida. Accordingly, venue is appropriate with this Court under 28 U.S.C. §1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to this action occurred.

## PARTIES

4.      Plaintiff KAREN L. HICKS is a natural persons over the age of eighteen (18), who resides in St. Petersburg, Pinellas County, Florida.

5.      Plaintiff is natural person allegedly obligated to pay a debt, as described herein, and is therefore a "consumer" as that term is defined by section 559.55(8), Florida Statutes.

6.      Plaintiff is the "called party" with respect to the calls placed to her cellular telephone number, (727) 410-1616, as further described herein. See Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 643 (7th Cir. 2012); Breslow v. Wells Fargo Bank, N.A., 755 F.3d 1265, 1266, 1267 Communications Reg. (P & F) 934, (11th Cir.2014).

7.      Defendant WELLS FARGO BANK, N.A. (hereafter "WELLS FARGO") is a foreign corporation with its primary place of business at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104, doing business in Florida through its registered agent Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301. Upon information and belief, WELLS FARGO services its mortgage loans through its division WELLS FARGO HOME MORTGAGE (hereafter "WFHM").

8.      Defendant ASSURANT, INC. (hereafter "ASSURANT") is a Delaware corporation with its principal office in New York, New York. ASSURANT participates in the force-placed insurance market through its trade name, Assurant Specialty Property, and its

business strategy "is to pursue long term growth in lender placed homeowner's insurance. . . The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through [ASSURANT's] lender placed program." [2]

9.      Upon information and belief, ASSURANT owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including AMERICAN SECURITY INSURANCE COMPANY) to operate their force-placed insurance business under that name.

10.      Defendant AMERICAN SECURITY INSURANCE COMPANY (hereafter "ASIC") is a Delaware corporation and an indirect subsidiary of ASSURANT, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia. ASIC often operates under the trade name "Assurant Specialty Property." American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

11.      Upon information and belief, ASIC passes much of its profits from force-placed insurance to its corporate parent, ASSURANT.

12.      Defendant ALDRIDGE CONNORS, LLP, (hereafter "ALDRIDGE CONNORS") is a Georgia Limited Liability Partnership with its primary place of business at Fifteen Piedmont Center, 3575 Piedmont Rd., NE, Suite 500, Atlanta GA, 30305, doing business in Florida through its registered agent and Florida Offices, at 1615 South Congress Road, Suite 200, Delray Beach FL, 33445. According to its website, ALDRIDGE CONNORS "is a full service provider of legal

---

[2] See Assurant Form 10-K for the fiscal year ending December 31, 2011, at 5, available  at http://www.sec.gov/Archives/edgar/data/1267238/000119312512075371/d257568d10k.htm.

services to depository and non-depository financial institutions including, banks, mortgage servicing concerns, institutional investors, private firms, and other commercial clients," focusing on the following practice areas, in relevant part: "Mortgage Default Services," "Litigation Services," "National Eviction Practice Group," and "Residential Real Estate Transaction Services."

## FACTUAL ALLEGATIONS

13.     At all times material hereto, Defendant WELLS FARGO sought to collect an alleged debt from Plaintiff KAREN L. HICKS that arose from a transaction allegedly incurred for personal, family or household purposes, and is therefore a "consumer debt" as that term is defined by section 559.55(6), Florida Statutes.

14.     At all times material, Defendant WELLS FARGO was the servicer of an alleged mortgage loan debt owed solely by Plaintiff's deceased mother, Donna Hicks (hereafter the "Subject Mortgage Loan"), which was secured by a residential property located at 5815 Bali Way N, St. Petersburg, FL 33706 (hereafter the "Subject Property"). The Subject Mortgage Loan debt is the subject of the unlawful collection activity at issue in this action.

15.     As described herein, Defendant WELLS FARGO employed business practices resulting in intentional harassment and abuse of the Plaintiff and engaged in patterns of outrageous, abusive and harassing conduct by and through its agents and representatives in an effort to collect the above referenced debt from the Plaintiff.

16.     Upon acquiring the servicing rights for the Subject Mortgage Loan, WELLS FARGO established an account for Donna Hicks, which included the following designations, in relevant part: the Subject Mortgage Loan was designated as "Loan Number 0035539972," and

4

Donna Hicks was designated as "Client Number 708" in connection with the Subject Mortgage Loan (hereafter collectively the "Donna Hicks Account").

17.     On June 17, 2008, Plaintiff's mother, Donna Hicks, passed away.

18.     At the time of her death on June 17, 2008, the total remaining balance owed by Donna Hicks on the Subject Mortgage Loan was approximately sixty-seven thousand dollars ($67,000).

19.     On July 15, 2008, Plaintiff sent Defendant WELLS FARGO a copy of the death certificate reflecting that Donna Hicks had passed away on June 17, 2008 (hereafter "Death Certificate"), and a copy of the Revocable Inter Vivos Trust Agreement of Donna Hicks (hereafter "Trust Agreement"), reflecting that Plaintiff is the Successor Trustee as well as the beneficiary for distribution on death. See Exhibit "A" hereto.

20.     Donna Hicks died intestate. Pursuant to the Trust Agreement, ownership of the Subject Property was transferred to Plaintiff. Furthermore, at the time of her death, Donna Hicks owned no property other than that which was distributed pursuant to the Trust Agreement. Accordingly, probate proceedings were not required under Florida law, and no probate estate was established with respect to Donna Hicks.

21.     Thereafter, Plaintiff attempted to contact Defendant WELLS FARGO in an effort to maintain possession of her deceased mother's property by paying off the Subject Mortgage Loan in full, in exchange for a satisfaction of mortgage, but was told by Defendant's representatives that WELLS FARGO had not received a copy of the Death Certificate and Trust Agreement, and therefore refused to discuss any details of the Donna Hicks Account with Plaintiff because she was not named on the loan agreement, was not a signatory to the loan agreement, and they would only speak with the party named on the loan agreement, Plaintiff's dead mother, Donna Hicks.

22.     Plaintiff subsequently mailed the Death Certificate and Trust Agreement to WELLS FARGO via US Mail on two (2) additional occasions. Each time Plaintiff mailed the Death Certificate and Trust Agreement, Plaintiff subsequently contacted WELLS FARGO to request the amount required to pay the Subject Mortgage Loan in full (hereafter "Total Payoff Amount"), and to discuss closing the Donna Hicks Account, and obtaining a satisfaction of the note and mortgage from WELLS FARGO. However, each time Plaintiff contacted WELLS FARGO after mailing the aforementioned documents, Defendant's representatives consistently denied having received the Death Certificate and Trust Agreement, refused to provide Plaintiff with the requested Total Payoff Amount, refused to discuss the winding down of the Donna Hicks Account or the satisfaction of the note and mortgage, and simply reiterated that WELLS FARGO would only speak with Donna Hicks regarding such account details.

23.     Over the course of the period described in paragraphs (18) through (21), above, during which time Plaintiff was attempting to obtain the information from Defendant necessary to pay the Subject Mortgage Loan in full and attempting to resolve Defendant's authorization and missing paperwork problems, as described above, Plaintiff voluntarily made several of the $1,615.92 monthly installment payments on the Subject Mortgage Loan.

24.     However, on or about July 15, 2010, Defendant illegally and without Plaintiff's authorization, debited $1,615.92 directly from Plaintiff's personal checking account with Wachovia Bank, purportedly representing a monthly installment payment owed under the Subject Mortgage Loan. Plaintiff had never provided Defendant with authorization to withdraw funds from the account at issue. Moreover, Plaintiff was at no time legally obligated to pay the Subject Mortgage Loan, nor did Plaintiff ever enter into any contractual agreement with respect to said debt.

6

25.     On or about July 26, 2010, Plaintiff sent Defendant WELLS FARGO a letter, certified mail, return receipt requested, article number 7009 1410 0001 3206 5588, notifying Defendant that it had illegally debited $1,615.92 from Plaintiff's personal checking account, without authorization, and demanded that it be returned immediately. See Exhibit "B" hereto.

26.     Thereafter, because of Defendant's illegal and unauthorized conduct in withdrawing funds from Plaintiff's private checking account, and in view of Defendant's ongoing refusal to cooperate with Plaintiff despite her efforts to comply with all of the Defendant's procedures for obtaining account authorization, Plaintiff discontinued making monthly installment payments on her deceased mother's Subject Mortgage Loan.

27.     Thereafter, Plaintiff began contacting the CEO of WELLS FARGO, John Stumpf, expressing her extreme disappointment with WELLS FARGO's business practices, and explaining the frustration, disappointment and anger she had experienced over the previous years as a result of WELLS FARGO's handling of this situation, immediately after unexpectedly losing her mother.

28.     On or about May 5, 2011, Plaintiff sent another letter to WELLS FARGO via UPS 2nd Day Air, tracking number 1ZBA595Y0292167396, once again enclosing copies of the Death Certificate and Trust Agreement. The letter was delivered to WELLS FARGO on or about May 9, 2011. See Exhibit "C" hereto.

29.     On or about May 13, 2011, Plaintiff communicated via telephone with a WELLS FARGO representative identified as "Jill Kottke," who was employed by Defendant as an "Executive Mortgage Specialist" in the office of WELLS FARGO's CEO, John Stumpf. During said call, Plaintiff explained to Ms. Kottke that she had mailed the Death Certificate and Trust Agreement to WELLS FARGO on four (4) separate occasions, the most recent of which occurred on May 5, 2011, and UPS confirmed that the letter sent on May 5, 2011 was received and signed

for by a WELLS FARGO representative on May 9, 2011 at 9:07 am. Ms. Kottke told Plaintiff that WELLS FARGO was not in possession of the Death Certificate and Trust Agreement, requested that Plaintiff provide proof of delivery, and refused to discuss any details of the Donna Hicks Account with Plaintiff.

30.    On or about May 15, 2011, Plaintiff sent a letter to Defendant's CEO, John Stumpf, via US Mail and Facsimile, summarizing Plaintiff's discussion with Ms. Kottke on May 13, 2011, as described above, and enclosing a copy of the UPS proof of delivery demonstrating that delivery was made on May 9, 2011 at 9:07 am. See Exhibit "D" hereto.

31.    On or about June 15, 2011, the Florida Default Law Group (hereafter "FDLG"), which had been retained by WELLS FARGO to pursue a foreclosure action with respect to the Subject Mortgage Loan, transmitted a "Payoff Letter" to Plaintiff. The Payoff Letter reflected that the "Total Payoff Amount" demanded by WELLS FARGO as of that date had increased significantly to $112,762.13 -- an increase of over $45,000, or 68%, from the amount owed exactly three (3) years prior -- and provided an itemization of the various charges that constitute the Total Payoff Amount, in addition to providing payment instruction for transmitting the Total Payoff Amount to the FDLG in exchange for a satisfaction of the note and mortgage. See Exhibit "E" hereto.

32.    On or about June 22, 2011, Plaintiff sent a letter to the FDLG offering to pay the $67,746.76 that was owed to WELLS FARGO when Donna Hicks passed away and when Plaintiff first began attempting to resolve this matter in full, prior to WELLS FARGO escalating the balance by imposing excessive amounts of unnecessary, false, and unearned fees, interest, and charges, which were solely attributable to WELLS FARGO's own reckless, willful, and/or malicious acts and omissions in servicing this loan.

33.     On or about July 20, 2011, Defendant's representative Jill Kottke sent a letter to Plaintiff explaining that she had thoroughly researched the issues previously raised by Plaintiff, as described above. With respect to Plaintiff's contentions that she sent the Death Certificate and Trust Agreement to WELLS FARGO on numerous occasions and that WELLS FARGO denied receiving them and refused to discuss the details of the Donna Hicks Account with Plaintiff, Ms. Kottke explained that WELLS FARGO can only provide "loan level" information to "authorized" parties, which, in the case of a deceased borrower, requires legal documents naming the party as the authorized representative of the estate. Ms. Kottke then acknowledged that Defendant's own records show that the Death Certificate and Trust Agreement were, in fact, received by WELLS FARGO on July 15, 2008, and again on August 15, 2008 but "[d]ue to an **oversight** this authorization was not added to the account until July 20, 2011." (emphasis added). See Exhibit "F" hereto.

34.     The aforementioned July 20, 2011 letter from Ms. Kottke went on to state that the FDLG forwarded Plaintiff's June 22, 2011 letter, in which she offered to pay the $67,746.76 that was owed on the loan when Plaintiff began contacting WELLS FARGO in July of 2008, to the owner of the loan, Federal Home Loan Mortgage Corporation (hereafter "Freddie Mac") for review, and that Freddie Mac had denied the offer, which it understood to be a "short payoff offer," because it was less than the $112,999.29 WELLS FARGO claimed was owed as of that date. Ms. Kottke further stated that the decision to reject Plaintiff's offer of $67,746.76 was motivated by the fact that the value of the Subject Property was sufficient to cover the entire escalated balance claimed by WELLS FARGO of $112,999.29 "if sold," ostensible referencing WELLS FARGO foreclosing on the mortgage and selling the property.

35.    On or about August 11, 2011, Plaintiff sent a follow-up letter to Jill Kottke, offering to increase Plaintiff's previous offer of $67,746.76, and would provide a check for $70,000 in exchange for a satisfaction of the note and mortgage, which would be payable in full immediately. Plaintiff noted that per Ms. Kottke's own admission, WELLS FARGO was in possession of multiple copies of the Death Certificate and Trust Agreement, the first of which was received on July 15, 2008, but WELLS FARGO's inexplicable failure to acknowledge Plaintiff as an "authorized" party prohibited viable communication for the entire three (3) year period from July of 2008 until Ms. Kottke finally resolved the issue in July of 2011, even though the appropriate documents were in Defendant's record system all along. Plaintiff added that she was "willing to come to the bargaining table" if WELLS FARGO were willing to engage in sincere, good faith communication in order to resolve all issues. See Exhibit "G" hereto.

36.    Defendant failed to respond to Plaintiff's above described August 11, 2011 letter, and declined to accept the Plaintiff's $70,000 offer set forth therein.

37.    Thereafter, in light of Defendant's refusal to even consider Plaintiff's aforementioned offers to pay off the loan in full for an amount that was representative of the balance owed at a time when, by WELLS FARGO's own admission, it possessed the necessary legal documents to provide Plaintiff with the information required to pay off the loan, and because of the incredible amount of time and emotional effort she had invested to no avail, Plaintiff ceased her efforts to settle the loan with WELLS FARGO.

38.    Although WELLS FARGO was well aware by 2011 that Plaintiff's mother was deceased, and it was likewise well aware that Plaintiff was not legally obligated to pay the Subject Mortgage Loan, inexplicably, in 2011, Defendant WELLS FARGO initiated its campaign of abusive and insensitive collection harassment against Plaintiff personally, including, in relevant

part: (1) by filing legal action against Plaintiff in which it was alleged that Plaintiff was liable to Defendant for a possible deficiency judgment; (2) by furnishing adverse credit reporting information to the Consumer Reporting Agencies ("CRA") with respect to Plaintiff, asserting that the Subject Mortgage Loan was a valid debt owed by Plaintiff, and that Plaintiff was severely delinquent with respect thereto; (3) by sending correspondence addressed to "Donna Hicks Deceased" and requesting that Plaintiff's deceased mother execute documents; (4) by placing more than a thousand collection calls to Plaintiff on her cellular telephone, home telephone, business telephone, and even her fax line, often times asking to speak with "Donna Hicks" regarding the subject loan, causing Plaintiff to become very upset and extremely emotional at times, having repeatedly instructed Defendant's representatives that Donna Hicks is deceased, and to stop calling her. Often times Defendant's calls, asking for her deceased mother regarding the mortgage, seemed callous, aggressive and unsympathetic, and caused Plaintiff to experience severe anxiety, resulting in Plaintiff frequently crying and having difficulty sleeping after getting the calls.

39.     Defendant WELLS FARGO has engaged in conduct in violation of the TCPA and the FCCPA, and constituting intentional harassment and abuse of the Plaintiff, by and through its agents and representatives, on numerous occasions, within the four (4) year period preceding the filing of this action, initiating calls to Plaintiff's aforementioned telephone and facsimile lines several times per day, and on back to back days, with such frequency as can reasonably be expected to harass, in an effort to collect the above described debt that Plaintiff does not owe.

40.     To date, Defendant WELLS FARGO has placed in excess of five hundred (500) calls to Plaintiff on her aforementioned cellular telephone number in an effort to collect the subject debt.

41.     Additionally, to date, Defendant WELLS FARGO has placed in excess of one-thousand (1,000) calls to Plaintiff on her residential, business and facsimile numbers in an effort to collect the subject debt.

42.     Notably, on several occasions, WELLS FARGO sent Plaintiff correspondence acknowledging Plaintiff's requests that the collection calls cease. Cf., Exhibit "H" hereto. However, Defendant's correspondence regarding making the calls stop was likewise received as insensitive and cruel, having been addressed to "Donna Hicks Deceased," stating "[t]hank you for your recent call," and requiring a signature from "Donna Hicks Deceased" in order to process the request. Moreover, Defendant simply disregarded Plaintiff's repeatedly verbal instructions that Defendant WELLS FARGO stop calling her regarding the subject debt. Defendant proceeded undeterred in its campaign of intentional harassment and abuse of the Plaintiff in an effort to collect the debt, including but not limited to:

    a.     Calling Plaintiff's aforementioned cellular telephone number, residential telephone number, business telephone number, and facsimile number, several times per day and on back to back days through the current date (or such time as will be established after a thorough review of Defendant's records). In most instances, Defendant would place multiple calls to the above described telephone numbers within minutes of each other;

    b.     Calling Plaintiff's aforementioned cellular telephone number, residential telephone number, business telephone number, and facsimile number, from an automated telephone dialing system and leaving pre-recorded messages on Plaintiff's answering machine and voice mail boxes, identifying Plaintiff and stating that the message was left in "an attempt to collect a debt";

c.      Calling Plaintiff's aforementioned cellular telephone number, residential telephone number, business telephone number, and facsimile number, and hanging up either prior to or as soon as Plaintiffs, members of Plaintiff's household, or the Plaintiff's answering machine or voice mail boxes answered the call;

d.      Calling Plaintiff from numerous different telephone numbers that appeared on Plaintiff's caller ID as someone or some entity other than Defendant or with no identification;

43.      During many of these calls, Defendant would leave messages on Plaintiff's answering machine, which is open to be heard by anyone in hearing range, stating that the message was left in an attempt to collect a debt. Plaintiff, and Plaintiff's minor children, were mortified when their guests heard these messages, as the messages gave the impression that Plaintiff could not pay her bills.

44.      The telephone calls at issue were placed by Defendant WELLS FARGO using an "automated telephone dialing system" as specified by the TCPA, 47 U.S.C. § 227(a)(1), which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers; and/or which has the capacity to dial numbers from a list without human intervention (hereafter "ATDS" or "autodialer").

45.      Defendant WELLS FARGO initiated each of the calls at issue to Plaintiff's aforementioned cellular telephone numbers without the "prior express consent" of Plaintiff, as specified by the TCPA, 47 U.S.C. § 227(b)(1)(A).

46.      Additionally, none of the telephone calls at issue were placed by Defendant WELLS FARGO to Plaintiff's aforementioned cellular telephone number for "emergency purposes" as specified by the TCPA, 47 U.S.C. §227 (b)(1)(A).

47.     Defendant WELLS FARGO willfully and/or knowingly violated the TCPA with respect to Plaintiff.

48.     Defendant WELLS FARGO has a corporate policy of using an automatic telephone dialing system or a pre-recorded or artificial voice message, just as it did when calling the Plaintiff's aforementioned cellular telephone number, as described herein.

49.     Despite actual knowledge of its wrongdoing, Defendant WELLS FARGO continued its campaign of abuse.

50.     Defendant WELLS FARGO's corporate policy provided no means for the Plaintiff to have her aforementioned cellular telephone number removed from the call list.

51.     Defendant WELLS FARGO has a corporate policy to harass and abuse individuals like the Plaintiff despite actual knowledge that the called parties did not provide prior express consent to receive the calls, or had revoked such prior express consent verbally, in writing, or through retention of legal counsel.

52.     In 2013, Defendant WELLS FARGO, by and though its current foreclosure counsel, Defendant ALDRIDGE CONNORS, initiated a foreclosure action against Plaintiff in a case styled *Wells Fargo Bank, N.A. v. Karen Hicks, et al, Case No.: 13-CI-002225-CI*, *in the Sixth Judicial Circuit in and for Pinellas County, Florida*, (hereafter "Foreclosure Action"), in which Defendants sought to enforce the security interest under the subject mortgage and sought payment on the subject promissory note, including seeking a potential deficiency judgment as against Plaintiff, despite the fact that Plaintiff was never legally obligated to pay the subject debt.

53.     Defendant's ongoing pattern of increasingly aggressive collection efforts against the Plaintiff, including the incessant collection calls often asking Plaintiff's dead mother, and the cruel letters addressed to "Donna Hicks Deceased," which served as a constant reminder of her

tragic passing, coupled with Defendant's false reporting of the debt to the CRAs as being owed by

Plaintiff, and its filing of a legal action aimed at seeking a personal deficiency judgment against

Plaintiff, caused Plaintiff to become exceedingly fearful that Defendant could potentially obtain a

deficiency judgment against her if WELLS FARGO continued escalating the total balance at the

same rate it previously had based on the previous payoff statement.

54. On or about January 2, 2015, Plaintiff filed an Emergency Motion to Compel in the

above described Foreclosure Action, seeking to compel WELLS FARGO to provide a payoff

figure for the subject debt, reflecting the total amount WELLS FARGO claimed it was owed as of

that date. See Exhibit "I" hereto.

55. On or about January 5, 2015, WELLS FARGO's foreclosure counsel, Defendant

ALDRIDGE CONNORS, sent Plaintiff a "payoff" letter, reflecting that the amount WELLS

FARGO claimed was owed as of that date had grown to an astonishing $203,797.17 – an increase

of over $136,000 (or 200%) more than the $67,000 owed on the loan when Plaintiff's mother died

and Plaintiff began requesting to payoff of the loan. The payoff statement reflected that the

$203,797.17 consisted, in large part, of a principal balance of 73,246.76, interest in the amount of

$19,888.06, and an escrow balance of $103,791.07. See Exhibit "J" hereto.

56. On or about January 12, 2015, Plaintiff filed a Motion for Detailed Accounting of

Payoff Figure and Motion for Hearing on Attorney's Fees in the above described Foreclosure

Action. See Exhibit "K" hereto.

57. On or about January 14, 2015, Defendant ALDRIDGE CONNORS provided a

breakdown of the escrow balance, reflecting that the majority of the $103,791.07 escrow balance

consisted of forced-placed insurance policies, which were placed by WELLS FARGO with its

affiliates, Defendants ASSURANT and ASIC, and which Plaintiff had never been made aware of

as a result of WELLS FARGO's refusal to communicate with Plaintiff concerning the details of the account for several years. <u>See</u> Exhibit "L" hereto.

58.     Upon receiving the above described payoff letter from ALDRIDGE CONNORS, and seeing the astronomical balance of $203,797.17 claimed by WELLS FARGO, Plaintiff feared that if she continued to defend the foreclosure suit, while WELLS FARGO continued to escalate the amount it claimed was owed, Plaintiff could be exposed to a significant judgment if she did not prevail. As a result, Plaintiff sold the home under duress, and nearly all of the money from the sale went to pay WELLS FARGO.

59.     After weighing her options, and considering the risk, Plaintiff made the decision to sell her mother's home in exchange for a satisfaction of the note and mortgage from WELLS FARGO, and thereby eliminating any risk that she could be wrongfully exposed to owing a money judgment.

60.     On January 20, 2015, WELLS FARGO executed a satisfaction of the subject mortgage, which was recorded on that same date in the Pinellas County Official Records at Book: 18651, Page: 283. <u>See</u> Exhibit "M" hereto.

61.     Despite the subject loan having been satisfied in full, and the satisfaction of mortgage having been executed by WELLS FARGO, Defendant ALDRIDGE CONNORS failed to inform the court in the foreclosure action of this fact, and declined to respond to Plaintiff's efforts to communicate with ALDRIDGE CONNORS regarding the cancellation of the forthcoming hearing on her motion to dismiss on the merits. Rather, ALDRIDGE CONNORS appeared at the hearing, in the absence of the Plaintiff, failed to inform the judge that the case was no longer in dispute, and continued to represent the case an ongoing matter.

62.     On February 3, 2015, Plaintiff filed a motion to dismiss in the foreclosure action, informing the court that the note and mortgage had been satisfied, enclosed a copy of the recorded release of mortgage, explained the above described facts regarding ALDRIDGE CONNORS's conduct, and requested attorney's fees and costs based on ALDRIDGE CONNORS's bad faith conduct in multiplying the proceedings.

63.     On April 10, 2015, ALDRIDGE CONNORS filed a Notice of Voluntary Dismissal Without Prejudice in the subject foreclosure action, which was subsequently recorded in the Pinellas County Official Records, at Book 18745, Page 1343.

64.     As set forth above, at no time was Plaintiff legally obligated to pay the Subject Mortgage Loan.

65.     At all times material hereto, Defendant ALDRIDGE CONNORS was aware that Plaintiff did not owe the subject debt to Defendant WELLS FARGO, but nevertheless, proceeded to threaten foreclosure in written correspondence prior to doing so, initiate foreclosure proceedings against Plaintiff to recover a deficiency judgment as against Plaintiff personally, and send Plaintiff collection letters reflecting amounts that the Plaintiff is not legally obligated to pay, and including an escrow balance consisting of excessively priced force-placed insurance policies, as described herein.

66.     Defendant WELLS FARGO followed its corporate policies when attempting to communicate with the Plaintiff in connection with the debt at issue.

67.     Defendant WELLS FARGO has been the recipient of numerous complaints from debtors, alleged debtors, and non-debtors across the country, similar to those alleged in this action by Plaintiff.

68. Defendant WELLS FARGO is, or should be, in possession and/or control of call logs, account notes, autodialer reports and/or other records that detail the exact number of calls made to Plaintiff's cellular telephone number over the relevant time period.

69. As a direct and proximate result of the acts or omissions of WELLS FARGO and ALDRIDGE CONNORS, as set forth herein, Plaintiff has suffered compensatory, statutory and actual damages in the form of emotional distress, anxiety, fear, worry, embarrassment and mental suffering, pain, anguish, and loss of capacity for the enjoyment of life.

70. Plaintiff's statutory and actual damages in the form of emotional distress, anxiety, fear, worry, embarrassment and mental suffering, pain, anguish, and loss of capacity for the enjoyment of life pursuant to section 559.77, Florida Statutes, and as described by 15 U.S.C. 1692 have continued and are continuing as of the filing of this complaint.

71. All conditions precedent to the filing of this action have occurred or have otherwise been waived.

## FORCE PLACED INSURANCE SPECIFIC ALLEGATIONS

72. Defendants ASSURANT and ASIC (hereafter collectively "The Assurant Defendants") have exclusive arrangements with Defendant WELLS FARGO to monitor its mortgage portfolio and provide force-placed insurance. In addition to the subsidized mortgage services it receives from the Assurant Defendants, WELLS FARGO and/or its affiliates are kicked back a percentage of the force-placed premium or are paid direct payments for the exclusive relationship disguised as qualified expense reimbursements. WELLS FARGO receives additional compensation through captive reinsurance arrangements.

73. The forced-placed insurance scheme works as follows: WELLS FARGO purchases master or "umbrella" insurance policies that cover its entire portfolio of mortgage

loans. In exchange, the Assurant Defendants are given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate. ASSURANT and its affiliates monitor WELLS FARGO's entire loan portfolio for lapses in borrowers' insurance coverage. Once a lapse is identified, an ASSURANT affiliate, (in this case, ASIC), sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued. If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

74. No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower. In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the borrower is charged for the "cost" of the past premiums.

75. Once coverage is forced on the property, WELLS FARGO pays the insurer for the premium and then charges the borrower for the payment, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan. The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

76. After WELLS FARGO pays the premiums to ASSURANT and ASIC, the Assurant Defendants kick back a set percentage of that amount to WELLS FARGO or its affiliates as a "commission." Upon information and belief, WELLS FARGO's affiliates share a percentage of that payment with WELLS FARGO, sometimes in the form of "soft dollar" credits.

77.     Further, WELLS FARGO has an arrangement with the Assurant Defendants that "qualified expense reimbursement" payments were to be made to WELLS FARGO and/or an affiliate of WELLS FARGO. These "expense reimbursements" are not legitimate reimbursements for actual costs and were simply another form of a kickback to WELLS FARGO for the exclusive arrangement to force-place insurance. These affiliates of WELLS FARGO are shell entities used exclusively for receipt of the illegitimate reimbursements and do not perform any bona fide services for the payments that they received.

78.     The money paid back to WELLS FARGO and its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, ASSURANT or ASIC will often disclose to the borrower that WELLS FARGO or its affiliates may earn commissions or compensation as a result of the forced placement of new coverage. In reality, however, no work is ever done by WELLS FARGO or the affiliates, to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place due to the exclusive relationship in place. As a result, no commission or compensation is "earned" and, in addition, neither WELLS FARGO nor its affiliates incur any costs in relation to force-placing insurance on any particular borrower and therefore no "expense reimbursement" is due.

79.     Under this highly profitable force-placed insurance scheme, WELLS FARGO is incentivized to purchase and force place insurance policies with artificially inflated premiums on a borrowers' properties because the higher the cost of the insurance policy, the higher the kickback.

80.     ASSURANT and WELLS FARGO also enter into agreements for ASIC to provide servicing activities on WELLS FARGO's entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower. The insurers

are able to provide these services at below cost because of the enormous profits they make from the hyper- inflated premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio. These charges, passed on to borrowers are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities.

81.     The small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring WELLS FARGO's entire loan portfolio, effectively resulting in a kickback.

82.     In addition, upon information and belief, the Assurant Defendants enter into essentially riskless "captive reinsurance arrangements" with WELLS FARGO's affiliates to "reinsure" the property insurance force-placed on borrowers.

83.     WELLS FARGO's reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to WELLS FARGO at borrowers' expense. While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and belief, WELLS FARGO and/or its affiliates enter into reinsurance agreements with the Assurant Defendants that provide that the insurer will return to WELLS FARGO significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to WELLS FARGO affiliates or subsidiaries. The ceded premiums are nothing more than a kickback to WELLS FARGO  and  a  method  for Defendants to profit from the forced placement of new coverage.  Indeed, while WELLS FARGO and/or its affiliates purportedly provided reinsurance, they did not assume any real risk.

21

84.     WELLS FARGO also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in its standard form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy. Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause. This means the borrower is charged for coverage for which the lender or servicer has no exposure.

85.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when WELLS FARGO adds the cost of the high-priced premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

86.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for force-placed insurance. These charges are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted administrative services.

87.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies. Force-placed policies are commercial insurance policies and their terms are determined by the lender or servicer -- WELLS FARGO, and the insurer -- the Assurant Defendants.

88.     Plaintiff challenges Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which WELLS FARGO purchases from the Assurant Defendants and then chooses to pass on to the borrower. Lenders, like WELLS FARGO, are financially motivated to utilize the insurer, like the Assurant Defendants, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," discounted tracking services, or ceded reinsurance premiums.

## COUNT I

### (Violation of the TCPA against WELLS FARGO)

89.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

90.     None of the calls at issue were placed by Defendant WELLS FARGO to Plaintiff's aforementioned cellular telephone number with the "prior express consent" of Plaintiff, as specified by the TCPA, 47 U.S.C. § 227(b)(1)(A).

91.     Furthermore, Plaintiff revoked any "prior express consent" Defendant WELLS FARGO may have mistakenly believed it had by verbally requesting that Defendant stop placing calls to her aforementioned cellular telephone number regarding the debt at issue on numerous occasions.

92.     Furthermore, none of the calls at issue were placed by Defendant WELLS FARGO to Plaintiff's aforementioned cellular telephone number for "emergency purposes" as specified by the TCPA, 47 U.S.C. §227 (b)(1)(A).

93.     Defendant WELLS FARGO willfully and/or knowingly violated the TCPA with respect to Plaintiff by repeatedly placing calls to Plaintiff's cellular telephone number using an ATDS and/or artificial or prerecorded voice without Plaintiff's prior express consent, invitation or

permission, and by continuing to call the Plaintiff after Plaintiff demanded that it cease placing calls, as specifically prohibited by the TCPA, 47 U.S.C. §227(b)(1)(A)(iii).

94.     The TCPA provides Plaintiff with a private right of action against Defendant WELLS FARGO for its violations of the TCPA, as described herein, pursuant to 47 U.S.C.A. § 227(b)(3), and permits both injunctive relief in addition to statutory damages.

WHEREFORE the Plaintiff, KAREN L. HICKS, respectfully demands judgment against Defendant WELLS FARGO for statutory damages, actual damages, punitive damages, an injunction from similar conduct in the future, costs, interest, and any other such relief the court may deem just and proper.

## COUNT II

### (Violation of the FCCPA against WELLS FARGO)

95.     Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

96.     At all times material to this action Defendant was and is subject to and must abide by the law of Florida, including section 559.72, Florida Statutes.

97.     Defendant WELLS FARGO engaged in an act or omission prohibited under section 559.72(5), Florida Statutes, by disclosing to a person, other than the Plaintiff or her family, information affecting the Plaintiff's reputation, whether or not for credit worthiness, with knowledge or reason to know that the other person does not have a legitimate business need for the information or that the information is false

98.     Defendant WELLS FARGO engaged in an act or omission prohibited under section 559.72(7), Florida Statutes, by willfully communicating with Plaintiff or any member of Plaintiff's family with such frequency as can reasonably be expected to harass the Plaintiff.

99.     Defendant WELLS FARGO engaged in an act or omission prohibited under section 559.72(7), Florida Statutes, by willfully engaging in other conduct which can reasonably be expected to abuse or harass the Plaintiff.

100.    Defendant WELLS FARGO engaged in an act or omission prohibited under section 559.72(9), Florida Statutes, by attempting to enforce a debt when such person knows that the debt is not legitimate, or asserting the existence of some other legal right when such person knows that the right does not exist.

101.    Defendant WELLS FARGO's actions have directly and proximately resulted in Plaintiff's prior and continuing sustaining of damages as described by section 559.77, Florida Statutes, including, but not limited to: statutory damages, actual damages in the form of emotional pain and suffering, fear, worry, embarrassment, humiliation and loss of the capacity for the enjoyment of life; and attorney fees, interest and costs.

WHEREFORE Plaintiff, KAREN L. HICKS, respectfully demands judgment against Defendant WELLS FARGO for statutory damages, actual damages, punitive damages, an injunction from similar conduct in the future, attorney fees, costs, interest and such other relief as this Court deems just and proper.

## COUNT III
### (Intentional Infliction of Emotional Distress against WELLS FARGO)

102.    Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

103.    The outrageous conduct of Defendant WELLS FARGO individually, and through its employees, agents, representatives and collectors, as described herein, deliberately, recklessly and/or intentionally inflicted emotional distress on the Plaintiff.

104.    The outrageous conduct of Defendant WELLS FARGO, as described herein, was directed at Plaintiff by and through Defendant's employees, agents, apparent agents or other persons acting to benefit and further the interests of Defendant, and acting in the course and scope of their employment or agency with Defendant.

105.    As a direct and proximate result of the outrageous conduct of Defendant WELLS FARGO as described herein, Plaintiff sustained mental pain and suffering, emotional distress, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff KAREN L. HICKS respectfully demands a trial by jury of all issues so triable and judgment against Defendant WELLS FARGO for compensatory damages, punitive damages, costs, interest and such other relief as this Court deems just and proper.

## COUNT IV
### (Slander of Credit against WELLS FARGO)

106.    Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

107.    Defendant WELLS FARGO reported the Subject Mortgage Loan to the Consumer Reporting Agencies (hereafter "CRAs") as a valid debt owed by Plaintiff, and that Plaintiff was severely delinquent, delinquent, resulting in the same being reflected on Plaintiff's credit reports.

108.    The above described reports to the CRAs by Defendant WELLS FARGO were false, as described herein, because Plaintiff has never had a legal obligation to pay the WELLS FARGO with respect to the Subject Mortgage Loan.

109.    In making the above reports to the CRAs, Defendant WELLS FARGO knew that they were false or exhibited a reckless and/or knowing disregard for their truth or falsity.

110.    As a direct result of the above described false credit reporting by Defendant WELLS FARGO, Plaintiff's credit scores and credit worthiness have been impaired.

111.    As a direct and proximate result of the above described false credit reports by Defendant WELLS FARGO, Plaintiff has suffered losses and damages.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant WELLS FARGO for compensatory damages, punitive damages, costs, interest and such other relief as this Court deems just and proper.

## COUNT V

### (Violation of the FCCPA against ALDRIDGE CONNORS)

112.    Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

113.    At all times material to this action Defendant ALDRIDGE CONNORS was and is subject to and must abide by the law of Florida, including section 559.72, Florida Statutes.

114.    Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under section 559.72(7), Florida Statutes, by willfully engaging in conduct, the natural consequence of which can reasonably be expected to abuse or harass the Plaintiff.

115.    Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under section 559.72(9), Florida Statutes, by attempting to enforce a debt when such person knows that the debt is not legitimate, or asserting the existence of some other legal right when such person knows that the right does not exist.

116.    Defendant ALDRIDGE CONNORS' actions have directly and proximately resulted in Plaintiff's prior and continuing sustaining of damages as described by section 559.77, Florida Statutes, including, but not limited to: statutory damages, actual damages in the form of emotional pain and suffering, fear, worry, embarrassment, humiliation and loss of the capacity for the enjoyment of life; and attorney fees, interest and costs.

WHEREFORE Plaintiff, KAREN L. HICKS, respectfully demands judgment against Defendant ALDRIDGE CONNORS for statutory damages, actual damages, punitive damages, an injunction from similar conduct in the future, attorney fees, costs, interest and such other relief as this Court deems just and proper.

## COUNT VI

### (Violation of the FDCPA against ALDRIDGE CONNORS)

117. Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

118. Plaintiff has been the object of collection activity by Defendant ALDRIDGE CONNORS arising from a consumer debt.

119. Defendant ALDRIDGE CONNORS regularly attempts to collect payments of consumer debts through litigation or legal proceedings, including but not limited to mortgage foreclosure actions, and is therefore a "debt collector" as defined by the FDCPA.

120. Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under 15 U.S.C. § 1692d by engaging in conduct in connection with the collection of a debt, the natural consequence of which is to harass, oppress, or abuse the Plaintiff.

121. Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under 15 U.S.C. § 1692e(2)(A) by falsely representing the character, amount, or legal status of any debt.

122. Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under 15 U.S.C. § 1692e(2)(B) by falsely representing the services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

123.     Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under 15 U.S.C. § 1692e(10) by using false representations or deceptive means to collect or attempt to collect a debt or to obtain information concerning the Plaintiff.

124.     Defendant ALDRIDGE CONNORS engaged in an act or omission prohibited under 15 U.S.C. § 1692f by using unfair or unconscionable means to collect or attempt to collect a debt from Plaintiff.

125.     Defendant ALDRIDGE CONNORS' acts and omissions as described herein have directly and proximately resulted in Plaintiff's prior and continuing sustaining of damages as described by 15 U.S.C. § 1692 including, but not limited to: statutory damages, actual damages in the form of emotional pain and suffering, fear, worry, embarrassment, humiliation and loss of the capacity for the enjoyment of life, and attorney fees, interest and costs.

126.     WHEREFORE Plaintiff, KAREN L. HICKS, respectfully demands judgment against Defendant ALDRIDGE CONNORS for statutory damages, actual damages, an injunction from similar conduct in the future, attorney fees, costs, interest and such other relief as this Court deems just and proper

## COUNT VII

### (Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), against WELLS FARGO, ASSURANT and ASIC)

127.     Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

128.     At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire

communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act (hereafter "RICO"), 18 U.S.C. § 1962(c).

129.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included WELLS FARGO, ASSURANT, and ASIC.

130.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing borrowers to pay unreasonably high charges for force-placed insurance through a scheme that inflated the premiums to cover kickbacks and expenses associated with monitoring WELLS FARGO's  entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

131.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained and ascertainable structure separate and distinct from the pattern of racketeering activity.

132.    Defendants WELLS FARGO, ASSURANT, and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

133.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff with the intent to defraud and deceive Plaintiff.  For example, ASSURANT and ASIC, with the approval of WELLS FARGO, sent form letters to Plaintiff on WELLS FARGO letterhead, stating that WELLS FARGO would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date.

These Defendants represented in the letters that they would charge Plaintiff for the "cost of the insurance." In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that Plaintiff was charged represented the cost of the policies when in fact such premiums cost more because they were inflated to include kickbacks, unmerited "expense reimbursements," reinsurance profits, discounts, or subsidized costs returned to WELLS FARGO or its affiliates. Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiff unreasonably high charges for the force-placed insurance.

134. For the purpose of executing the scheme to defraud, Defendants sent, mailed and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiff that they could charge Plaintiff unreasonably high force-placed insurance premiums. Defendants also transferred sums among themselves, including but not limited to various forms of kickbacks, in furtherance of their scheme to defraud Plaintiff, in violation of the wire fraud statutes.

135. By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiff in the form of unreasonably high charges for force-placed insurance premiums, which Defendant WELLS FARGO has sought to collect from Plaintiff individually by virtue of the above described Foreclosure Proceeding.

WHEREFORE, Plaintiff KAREN L. HICKS respectfully demands judgment against Defendants WELLS FARGO, ASSURANT and ASIC for compensatory and treble damages, and

attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c), plus interest and such other relief as this Court deems just and proper.

## COUNT VIII

**(Violation of the Racketeer Influenced and Corrupt Organizations
Act, 18 U.S.C. § 1962(d) Against WELLS FARGO, ASSURANT and ASIC)**

136.    Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

137.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

138.    Defendants agreed that ASIC and ASSURANT would be WELLS FARGO's exclusive force-placed insurance providers and would extract the unreasonably high premiums from WELLS FARGO's customers.  Defendants also agreed that the Assurant Defendants would pay kickbacks to WELLS FARGO or its affiliates.

139.    WELLS FARGO affiliates pass much of these profits from this scheme to WELLS FARGO.

140.    ASIC passes much of its profits from this scheme to ASSURANT.

141.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

142.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff suffered damages in the form of unreasonably high force-placed insurance premiums.

WHEREFORE, Plaintiff KAREN L. HICKS respectfully demands judgment against Defendants WELLS FARGO, ASSURANT and ASIC for compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(d), plus interest and such other relief as this Court deems just and proper.

## COUNT IV

## (Violation of RESPA, 12 U.S.C. § 2601, *et seq*, against WELLS FARGO)

143.    Plaintiff re-alleges and incorporates by reference the allegations of Paragraphs (1) through (65), as if fully set forth herein.

144.    The subject mortgage loan qualifies as a "federally related mortgage loan" under § 2602(1)(B)(i) because the mortgage loan was made in whole or in part by a lender, the deposits or accounts of which are insured by any agency of the Federal Government, or were made in whole or in part by a lender which is regulated by any agency of the Federal Government.

145.    This claim for relief arises under 12 U.S.C. § 2605 which authorizes, among other things, actual damages in an individual action.

146.    This section of RESPA requires that all charges related to force-placed insurance, apart from charges subject to state regulation as the business of insurance, imposed on the borrower by or through the servicer shall be *bona fide and reasonable*.

147.    WELLS FARGO is a mortgage servicer or lender to whom the requirements of section 2605 of RESPA apply.

148.    Wells Fargo has violated § 2605 of RESPA by charging premiums that are unfairly and egregiously costly. This excessively-priced, force-placed insurance cannot be considered *bona fide* and reasonable because Wells Fargo exercised its discretion in choosing an insurance policy capriciously, in bad faith, and in contravention of the parties' reasonable expectations by

purposefully selecting an exorbitantly-priced policy and by giving and receiving kickbacks for the procurement of these exorbitantly-priced, force-placed insurance policies. It has negotiated exclusive terms with the Assurant Defendants whereby it receives kickbacks tied to the cost of the insurance premiums. This incentive drives WELLS FARGO to purchase the highest priced forced placed insurance policy that it can, and to often include coverage that is unnecessary.

149.    The force-placed insurance purchased by WELLS FARGO and passed on to Plaintiff cannot be considered bona fide and reasonable as it can cost up to ten times the amount of standard insurance that a borrower was previously paying or could obtain on the open market.

150.    Furthermore, the high-priced premiums charged to Plaintiff cannot be considered reasonable because, despite WELLS FARGO receiving a kickback or commission on each policy it purchases, it does not pass that savings amount on to Plaintiff. Instead, it still charges the borrowers the full unwarranted and unreasonable amount for the exorbitantly-priced and/or backdated force-placed insurance.

151.    The foregoing actions constitute a general business practice and pattern of WELLS FARGO.

WHEREFORE, Plaintiff KAREN L. HICKS respectfully demands judgment against Defendant WELLS FARGO, for actual damages in the form of unreasonable force-placed insurance premiums in violation of Section 2605 of RESPA, together with additional damages the court may allow as a result of the pattern of purchasing high-priced and unnecessary force-placed insurance in order to collect a large kickback or commission, in addition to attorneys' fees and costs, interest, and such other relief as this Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of May, 2015, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send a notice of electronic filings via the Court's ECF system to all CM/ECF participants.

<u>*s/David P. Mitchell*</u>
David P. Mitchell, Esq.
Florida Bar No. 067249
MANEY & GORDON, P.A.
101 East Kennedy Blvd., Suite 3170
Tampa, Florida 33602
Telephone: (813) 221-1366
Fax: (813) 223-5920
David@MitchellConsumerLaw.com
d.mitchell@maneygordon.com
v.marrero@maneygordon.com
Counsel for Plaintiff